**Olga FINLEY and Robert Finley, Plaintiffs,**

v.

**NCR CORPORATION, et al., Defendants.**

**Civil Action No. 92–5242.**

United States District Court,
D. New Jersey.

Jan. 22, 1996.

sessed from December 31, 1975, on the missing- check royalties.

Heide P. Rubin Cohen, Greitzer and Locks, Cherry Hill, NJ, for Plaintiffs Olga and Robert Finley.

Joli Lyn Gross, Edwards & Angell, Newark, NJ, for Defendant NCR Corp.

Francis M. Hadden, Hecker, Brown, Sherry & Johnson, Haddonfield, NJ, for Defendant Key Tronic Corp.

## ORDER

RODRIGUEZ, District Judge.

This matter is before the court on the motion of defendant NCR Corporation for summary judgment, pursuant to Fed. R.Civ.P. 56(b). For the reasons set forth below, the court will grant defendant's motion for summary judgment.

## I. BACKGROUND

Plaintiffs, Olga Finley and her husband, Robert Finley, filed this product liability action against defendant NCR Corporation ("NCR"), among others, alleging that defendant designed, manufactured, or supplied a model 7100 keyboard that caused Olga Finley, an accounts payable manager, to develop carpal tunnel syndrome ("CTS"). Robert Finley states a claim for loss of consortium.

Defendant NCR contends that it is entitled to summary judgment because plaintiffs can-

not meet their burden of proving their strict-liability claim. Specifically, NCR asserts that plaintiffs cannot link the 7100 keyboard as the proximate cause of Olga Finley's injuries. Also, NCR contends that plaintiffs' breach of implied warranty and negligence claims are barred by the New Jersey Product Liability Act. Finally, NCR claims that there is no evidence to support plaintiffs' conspiracy allegation. As a result, NCR argues that summary judgment should be granted in its favor on all counts.

## II. DISCUSSION

### A. *Summary Judgment Standard*

The entry of summary judgment is appropriate only when "there is no genuine issue of material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Whether a fact is indeed "material" is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If a disputed fact exists that under the controlling substantive law might affect the outcome of the suit, the entry of summary judgment is precluded. *Id.*

The moving party bears the responsibility of informing the district court of the basis for its motion. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. In addition, this party must identify those portions of the pleadings, discovery papers and affidavits (if any) which demonstrate that no genuine issue of material fact exists. *Id.* Once the moving party has satisfied these requirements, the burden shifts to the non-moving party to present affirmative evidence that a material fact is genuine. If the evidence is such that "a reasonable jury might return a verdict in his favor," summary judgment will not be granted. *Anderson*, 477 U.S. at 248, 257, 106 S.Ct. at 2510, 2514–15.

### B. *Product Liability Claim*

Defendant NCR asks this court to grant summary judgment in its favor on two grounds: first, the cause of Olga Finley's injuries has not been clearly established by medical evidence; and second, NCR's failure to warn was not a proximate cause of Olga Finley's injuries. NCR claims that its computer keyboard is not defectively designed and does not require a warning.

Under New Jersey law, a plaintiff in a strict-liability tort action must prove that the defendant's product was defective.[1] *Feldman v. Lederle Laboratories*, 97 N.J. 429, 433, 479 A.2d 374, 376 (1984). The defect may take one of three forms: a manufacturing flaw, a design defect, or an inadequate warning. *Id.* In this case, plaintiffs' allegations rely on the latter two forms and plaintiffs proffer expert testimony to advance their arguments. NCR, on the other hand, contends that plaintiffs' experts cannot supply sufficient evidence to establish that NCR's keyboard caused Olga Finley to contract CTS. Because "expert testimony is crucial on the issues of causation and alternative design," a *Daubert* analysis is necessary. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

In *Daubert*, the United States Supreme Court stated that a trial judge must ensure that any and all scientific testimony or evidence admitted is both reliable and relevant. *Id.* at 589–91, 113 S.Ct. at 2795. The Court further stated that the primary locus of this obligation is Federal Rule of Evidence 702. This rule provides that:

... if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

---

1. When it is claimed, as plaintiffs claim here, that a product has been defectively designed, the court must first apply a risk-utility analysis to determine whether the utility of the product outweighs its risk of harm. *Macri v. Ames McDon-ough Co.*, 211 N.J.Super. 636, 639, 512 A.2d 548, 550 (App.Div.1986). At this time, the utility of a keyboard overwhelmingly outweighs the risk of its use.

Fed.R.Evid. 702. Rule 702's requirement that "an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795. Rule 702's requirement that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue" goes primarily to relevance. *Id. Daubert* indicated that a district court must determine the admissibility of the proposed expert testimony pursuant to Federal Rules of Evidence 104 by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid and [ ] whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. at 2796. The Court then delineated four factors that a trial judge should consider when deciding whether to admit expert testimony pursuant to Federal Rules of Evidence 102. Those factors are:

> (1) whether the theory or technique in question can be (and has been) tested;
> (2) whether the theory or technique has been subjected to peer review and publication;
> (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and
> (4) general acceptance.

*Id.* at 591–95, 113 S.Ct. at 2796–97. These factors were intended as general guidance and not as a definitive checklist. *Id.* In *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717 (3d Cir.1994), Judge Becker suggested that in addition to the above considerations, other factors to take into account include: the existence of standards controlling the technique's operation; the relationship of the technique to methods which have been established to be reliable; the qualifications of the expert witness testifying based on the methodology; and the non-judicial uses to which the method has been put. *Id.* at 742 n. 8.

█ NCR contends that plaintiffs' medical expert, Dr. Scott H. Jaeger, cannot establish causation between defendant's keyboard and Olga Finley's CTS, because his testimony is not scientifically reliable. Consideration of Dr. Jaeger's deposition compels the conclusion that his opinion must be deemed inadmissible under *Daubert.* His qualifications appear satisfactory. (*See* Defendant Exhibit 1.) However, Dr. Jaeger's deposition indicates that he believes two conditions must be present to produce CTS—personal predisposition and ergonomic inciting events. (Jaeger Deposition at 7.) Dr. Jaeger indicates that he believes age, gender (females are eight times as likely to acquire CTS than men), and weight are predisposing factors for CTS. (*Id.* at 31.) Further, Dr. Jaeger has never seen Olga Finley's workplace (*id.* at 27); he concedes that he knows nothing about NCR's keyboard (*id.* at 28); he does not hold the opinion that the characteristics of the keyboard caused Olga Finley's CTS (*id.* at 29); and he has no knowledge concerning the equipment or furnishings she used with the keyboard (*id.*). In addition, Dr. Jaeger stated that, "[a]s time goes on, everyone will develop [CTS] to some degree." (*Id.* at 43.) He also believes that there is an over-diagnosis and over-treatment of CTS. (*Id.* at 51.) Dr. Jaeger first formed his personal belief that word processors are an ergonomic risk factor in 1986. (*Id.* at 57.) However, he does not know of any published medical, ergonomic, or scientific literature setting forth as a matter of scientific knowledge that the use of computer keyboards causes CTS. (*Id.*) Thus, he declines to state that his belief rises to the level of verified knowledge. (*Id.*)

Additionally, a method to test Dr. Jaeger's hypothesis that NCR's keyboard caused Olga Finley to develop CTS has yet to be developed. The literature set forth by plaintiffs provides no way for this court to know how Jaeger's theory is derived from the articles. Dr. Jaeger's concession that there is no literature tying the use of computer keyboards to CTS indicates that his method, at this time, has not been tested. Moreover, the potential rate of error of such method is unknown as Dr. Jaeger has not conducted a controlled study. In addition, there is no indication that his method has been generally accepted in the medical community. Dr. Jaeger's testimony thus fails to satisfy almost all of the elements outlined in *Daubert* and *Paoli.* Dr.

Jaeger's opinion amounts to this: repetitive movements of the hand and wrist increase one's risk of being exposed to CTS.

In light of the above, this court cannot find that Dr. Jaeger's testimony is so scientifically reliable as to support the contention of a causal link between NCR's keyboard and Olga Finley's CTS. Moreover, a district court in Michigan, when considering a claim similar to that of the plaintiffs, refused under *Daubert* to allow entry of a doctor's testimony which mirrors Dr. Jaeger's. *Spears v. Unisys Corp.*, No. 93CV71183DT, 1995 WL 871152 (E.D.Mich., May 15, 1995). There, too, the expert could point to no controlled study determining the relationship between keyboards and CTS. As with Dr. Jaeger's theory, the expert's theory had not been tested and his testimony revealed no known rate of error of his hypothesis. As in the instant case, the expert did not examine the actual keyboard plaintiff used at work. Lastly, again as in this case, the expert did not obtain a work description or other information from the plaintiff's employer to develop accurate task evaluations and define specifically the physical demands of plaintiff's employment. For those reasons, among others, the court found that the expert's testimony did not reach the standard of scientific knowledge. *Id.*

■ Plaintiffs' second expert, Dr. David A. Thompson, is a professional engineer. Dr. Thompson's opinion similarly fails to satisfy the requirements of *Daubert*. Dr. Thompson, who is an Emeritus Professor of Industrial Engineering and Engineering Management at Stanford University, inspected and photographed a typical NCR keyboard, and he also interviewed Olga Finley concerning her use of the keyboard. Based on ANSI/HFS standards, European studies, and various other studies conducted by engineers, Dr. Thompson concludes that NCR's keyboard is defectively designed because of its allegedly inadequate key tactile feedback, ex-

cessive key forces required, excessive keyboard thickness with no wrist support, and lack of instructions accompanying the keyboard and related equipment to instruct the operators in the special use circumstances of keyboard operating and its related hazards. However, Dr. Thompson's report does not support the conclusion that it is more likely than not that NCR's keyboard design caused Olga Finley to develop CTS.

Dr. Thompson's report suggests that NCR's keyboard is not the most technologically advanced, but it fails to link substantially Olga Finley's injury to the design of NCR's keyboard. Dr. Thompson is not, and does not claim to be, a treating physician. His report reflects no consideration of personal predisposition, i.e., he did not consider plaintiff's age, gender, or weight. Nor does Dr. Thompson document studies showing how NCR's keyboard design, which presumably is so ill-constructed as compared to other designs, has led to a disproportionately large number of persons developing CTS. Moreover, although Dr. Thompson states what is an appropriate amount of force that a keyboard should require and that NCR's keyboard requires too much force, he fails to show that people who use keyboards requiring less force are less likely to get CTS. Thus, the relevant conclusion drawn from Dr. Thompson's report is that an undetermined amount of work requiring repetitive manual motion is tangentially related to, but not the substantial cause of, the development of CTS. Moreover, a California Superior Court has previously rejected Dr. Thompson's testimony for the same reasons.[2] In short, despite Dr. Thompson's conclusion that NCR's keyboard design contributed to causing Olga Finley's injury, the report fails to address the question whether her injury was proximately caused by the design of the keyboard as opposed to the manner in which she used it or some physical attribute of Finley.[3]

---

2. In *Brust v. Apple Computer, Inc.*, Superior Court of California, No. 95-0200 (July 27, 1995), the judge stated that "[u]ltimately, Dr. Thompson testified to force factors that were related to one's use of a keyboard and a mouse but there was no testimony at all about causation."

3. A Georgia district court reached a similar conclusion when deeming inadmissible under *Daubert* the expert testimony of a mechanical engineer. *See Little v. NCR Corp.*, No. 1:93-cv-1555-FMH, at *11 (N.D.Ga., Dec. 7, 1995). Despite the plaintiff's claims of defective design and fail-

Thus, Dr. Thompson's opinion does not pass muster under *Daubert*.

Dr. Michael J. Smith testified that operation of computer terminals causes CTS. Yet he concedes that it is work activity and not necessarily the design of a particular keyboard that is the proximate cause of CTS. (Smith Deposition at 26.) In any event, Smith's testimony duplicates Dr. Jaeger's, and thus must be discounted for the same reasons. The testimony of several other experts similarly fails to establish causation.[4] Because the proffered expert testimony cannot, under *Daubert*, establish that NCR's keyboard caused Olga Finley to acquire CTS, NCR is entitled to summary judgment on this issue.

NCR next argues that it had no duty to warn plaintiffs of any danger. New Jersey's product liability law, codified in 1987 through the enactment of N.J. STAT. ANN. 2A:58C, establishes the test to be applied in determining the adequacy of a product warning or instruction. "[I]n any product liability action the manufacturer or seller of a product will not be liable for harm caused by a failure to warn if the product contains an adequate warning or instruction." N.J. STAT. ANN. 2A:58C–4 (West 1987 & Supp.1995).

 The New Jersey Supreme Court has interpreted the above statute as follows: a manufacturer is under a duty to warn foreseeable users of the dangers of using a particular machine if without such a warning the machine is not reasonably safe. *Campos v. Firestone Tire & Rubber Co.*, 98 N.J. 198, 207, 485 A.2d 305, 309 (1984). A manufacturer neglecting to caution against the dangers of using its product should be held strictly liable for injuries arising from the absence of such warnings. *Id.* But an initial inquiry to be resolved by the trial court involves whether a duty exists. Disposition of this issue requires consideration of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution. *Id.*

*Campos* stated that relevant questions to this end included the following:

> Is the lack of the warning consonant with the duty to place in the stream of commerce only products that are reasonably safe, suitable, and fit? Will the absence of a duty encourage manufacturers to eliminate warnings or to produce inadequate warnings? Is the danger so basic to the functioning or purpose of the product—for example, the fact that a match will burn—that a warning would serve no useful purpose?

*Id.* at 207–08, 485 A.2d at 310.

█ As for the first question, it appears that the lack of a warning on NCR's keyboard does not violate a duty to place only reasonably safe products in the stream of commerce. To declare that keyboards are not reasonably safe seems inappropriate in a society in which toys sold for the amusement of children are potentially more dangerous. Next, it is unknown whether a duty to warn is yet required for manufactures or distributors of computer keyboards. At this stage, it is just as likely that personal characteristics combined with physical repetition contribute far more to developing CTS than do the characteristics of keyboards. Moreover, warning persons from using keyboards beyond a tolerable level of pain seems beside the point. Like most things that produce pain, it should be self-evident that a pain-producing activity is a threat to health.

Although there is little case law to guide this analysis, the Third Circuit Court of Appeals has held that there is no duty to warn about the physical manipulation inherent in the use of certain objects which can in some persons and under some circumstances cause CTS. *Creamer v. IBM Corp.*, No. 89–1026, slip op. at 6–7, 877 F.2d 54 (3d Cir., May 18, 1989). In *Creamer*, the plaintiff alleged that a grocery scanner should have contained a warning regarding the dangers of repetitive use. The court stated that the mere fact

ure to warn, that court granted summary judgment in favor of the defendant.

**4.** Of course, although they cannot be considered objective experts, Mark Hoffman, engineer at NCR, and Gary Wagner, consulting analyst at

NCR, provide no support in their depositions for plaintiffs' proposition that NCR's keyboard causes CTS. The deposition of Dr. James B. Massengill also states that he does not know why Olga Finley developed CTS.

that the scanner required the plaintiff to move items across it did not give rise to a duty to warn. The plaintiff's injuries arose not from the design of the scanner, because the scanner itself did not dictate how the plaintiff scanned the items. Objects were merely manually passed over it. Likewise, the fact that Olga Finley performed repetitive manual work while using the keyboard suggests that a duty to warn should not attach to such activities simply because those activities could, like the activity involving the scanner *Creamer*, cause CTS.

The *Creamer* court stated that "[t]he relative efficiency of a machine is not relevant to defective design. For example, a manual typewriter is not unreasonably dangerous simply because an electric typewriter might require less physical exertion by a user." This reasoning was also accepted by the United States District Court, Middle District of Louisiana, in *Hopkins v. NCR Corp.*, No. 93–188–B–M2, 1994 WL 757510 (M.D.La. 1994). The *Hopkins* court concluded that a contrary holding would necessitate a warning on any object that involves extended manual manipulation inherent in the ordinary use of the object. The court expanded on *Creamer*'s analogy by citing sports equipment, computers, video games, remote controls, calculators, musical instruments, appliances, garden tools, writing utensils, kitchen utensils, and workman's tools as all potentially falling under the umbrella of such a holding. Additionally, a California Superior Court in *Brust v. Apple Computer, Inc.*, No. 95–0200 (July 27, 1995), similarly dismissed a case involving an allegation that a keyboard's design caused the plaintiff to develop CTS. *See also Little v. NCR Corp.*, No. 1:93–cv–1555–FMH, at *20 (N.D.Ga., Dec. 7, 1995).

▪ Plaintiffs posit that the above cases are inapposite. Plaintiffs essentially rely on trivial distinctions among *Hopkins, Creamer*, and the instant case, and then seek to support their reasoning with a state court decision from Minnesota. For example, plaintiffs contend that *Creamer* involved only a supermarket scanner and not a computer keyboard. But the principle underlying the *Creamer* opinion is not limited to the particular machine used. It is that the relative

efficiency of one machine does not render it unreasonably dangerous simply because less physical exertion is required of another, more modern machine.

Plaintiffs' reliance on *Urbanski v. IBM Corp.*, First Judicial District, County of Dakota, State of Minnesota, Docket No. 19–C2–93–8285 (Dec. 27, 1994), is neither persuasive nor instructive. There, in denying summary judgment for the defendant, the court found factual issues regarding defective design of the keyboard. But the court's decision somewhat surprisingly devotes only one sentence to *Daubert*. Although the defendant argued that the plaintiff's experts could not establish the requisite causation, the *Urbanski* court appears to have assumed "cause" by stating that it would, in a later memorandum, address *Daubert* arguments. The *Urbanski* court concluded that plaintiff's expert testimony would be permitted subject to timely and appropriate objections. Aside from the fact that *Urbanski* is not as persuasive as *Hopkins* and *Creamer*, it seems insufficient to rely on an assurance by the *Urbanski* court that an adequate explanation for admitting the expert testimony would be forthcoming.

Finally, plaintiffs cite to many articles concerning injuries resulting from keyboard use. However, the articles by themselves cannot form the basis upon which one could decide causation. *See Brust, supra.* In the absence of a controlled study, they constitute only anecdotal material and not reliable proof in this particular case.

### C. Implied Warranty and Negligence Claims

Plaintiffs do not oppose NCR's assertion that the claims of breach of implied warranty and negligence are inapplicable to this case. Consequently, NCR is entitled to summary judgment on both claims.

### D. Conspiracy Claim

▪ To establish a civil conspiracy claim, plaintiffs must show the existence of an agreement between NCR and another to commit an unlawful act or a lawful act by unlawful means, and an overt act in further-

ance of the agreement resulting in damage. *Hampton v. Hanrahan,* 600 F.2d 600, 620–21 (3d Cir.1979). Neither an unlawful act nor unlawful means used to commit such an act can reasonably be gleaned from the submitted pleadings, affidavits, and depositions. Thus, NCR is entitled to summary judgment on the conspiracy claim.

### E. Loss of Consortium Claim

Robert Finley seeks compensation for loss of consortium resulting from Olga Finley's development of CTS. Loss of consortium is a derivative claim which depends for its sustenance upon a viable tort claim of the spouse. *Reilly v. Prudential Property and Casualty Insurance Co.,* 653 F.Supp. 725 (D.N.J.1987). Because NCR has been awarded summary judgment on all of Olga Finley's claims, Robert Finley, as her husband, has no foundation from which to derive a loss of consortium claim.

### III. CONCLUSION

For the foregoing reasons,

IT IS ORDERED on this 22nd day of January, 1996 that defendant NCR's motion for summary judgment is *GRANTED.*