**Carole REIFF and Ronald Reiff, her husband, Plaintiffs,**

v.

**CONVERGENT TECHNOLOGIES, Convergent Incorporated, Unisys Corporation, and John Does one through twenty, Defendants.**

Civil Action No. 95–3575 (JEI).

United States District Court, D. New Jersey.

Feb. 28, 1997.

Greitzer & Locks by James J. Pettit and Heidi P. Rubin Cohen, Cherry Hill, NJ, for Plaintiffs.

Porzio, Bromberg & Newman by Steven P. Benenson and Peter A. Drucker, Morristown, NJ, for Defendants.

### OPINION

IRENAS, District Judge:

Plaintiffs instituted this products liability action against a manufacturer of computer keyboards seeking damages for personal injuries and loss of consortium. Defendants now move the Court to preclude plaintiffs' expert testimony pursuant to Federal Rules of Evidence 403, 702, and 703. Because the admissible proffered expert testimony fails to establish a defect in defendants' keyboard or establish specific causation between defendants' product and plaintiffs' injuries, the Court will grant defendants' motion in part, grant defendants summary judgment, and dismiss this action in its entirety.

### I. BACKGROUND

Since 1988, plaintiff Carole Reiff has worked as a secretary for the township of Howell, New Jersey. In performing her job, Mrs. Reiff types on a computer keyboard on the average of twenty-five to thirty hours each week. By the early 1990's, she began to experience numbness and pain in her wrists and hands. Doctors diagnosed her with bilateral carpal tunnel syndrome in June, 1994. Mrs. Reiff underwent surgery on two separate occasions in March, 1995 to alleviate her condition and returned to work that May. In January, 1996, Mrs. Reiff began using a new computer keyboard made by Microsoft that is split into two halves with each half horizontally rotated to form an obtuse angle, arguably an ergonomically superior design.[1]

On June 21, 1995, plaintiffs instituted this action against the manufacturer of the computer keyboard Mrs. Reiff used at work between 1989 and 1995 and its parent companies.[2] In support of their claims, plaintiffs retained as experts Alan Hedge, Ph.D., an engineer and ergonomist, Karl H.E. Kroemer, Ph.D., an engineer and ergonomist, Robert J. Cunitz, Ph.D. a human factors psychologist, and Gary M. Goldstein, M.D. a physician. Through these experts, plaintiffs hope to establish that defendants' computer keyboard was defective and that its defects caused Mrs. Reiff's condition.

Dr. Hedge tested defendants' computer keyboard to determine whether it requires excessive keying forces. He first chose a representative key from each keyboard row to test—E from the top row, H from the home row, and M from the first row. With a hand-held push-pull force gauge, he then tested the force required to activate each key at its center and at each of its four corners. Last, he averaged the results for each key location and compared them to industry key-force parameters and defendants' company specifications. *See* ANSI–HFS 100, *American National Standard for Human Factors Engineering of Visual Display Terminal Workstations* § 7.10 (1988) [hereinafter ANSI–HFS 100]; Defendants' Ex. 8 (Company Specifications).

ANSI–HFS 100 provides that the force required to activate keyboard keys should range between 0.25 N and 1.50 N—preferably between 0.50 N and 0.60 N—when struck

---

1. Ergonomics is the study of human interaction with machines. *See* Webster's Third New International Dictionary 770 (1986). Ergonomists have recommended the Microsoft and similarly split keyboards because they promote a more comfortable and presumably healthier typing posture. *See infra* part III.A.2.

2. Convergent Technologies manufactured Mrs. Reiff's computer keyboard; Unisys Corporation

vertically at a key's center.[3] *See id.* When struck vertically at the center, the E, H, and M keys scored 0.61 N, 0.58 N, and 0.62 N respectively—each well within the ANSI–HFS standard. At their corners, the H and M keys still averaged within the acceptable ANSI–HFS range, while the E key exceeded it. Specifically, at its top left corner, the E key required between approximately 2.10 N for activation. *See* Defendants' Ex. 6 at Fig. 7 (Hedge Report dated June 10, 1995).[4]

From these results, Dr. Hedge concludes that defendants' keyboard requires excessive keyforces. *See id.* at 5. Because "carpal tunnel syndrome arise[s] from a mix of [three] ergonomic factors—force, repetition, and posture," Dr. Hedge considers the excessive keyforces required by defendants' keyboard to be a product defect. *See* Defendants' Ex. 7 at 6 (Hedge Report dated June 10, 1995).

Asked to compare defendants' keyboard to the new Microsoft split keyboard, Dr. Hedge added to his earlier reports. He reviewed a study of the Microsoft keyboard, the warnings about keyboard use accompanying the Microsoft keyboard, and Mrs. Reiff's deposition testimony concerning her comfort typing on the Microsoft keyboard. Based on this review, Dr. Hedge concludes that Mrs. Reiff's injuries could have been minimized if not prevented had defendants' keyboard been designed like the Microsoft keyboard or had defendants' keyboard contained user warnings like those in the Microsoft keyboard's owner's manual. *See* Defendants' Ex. 12 at 2 (Hedge Report dated June 19, 1996). Accordingly, he considers defendants' keyboard's conventional design and lack of warnings both product defects, as well.[5]

Dr. Kroemer reviewed hundreds of publications relating to keyboard use and cumula-

tive trauma disorders ("CTDs") to determine the relevant "state of the art" of computer keyboard design. *See* Defendants' Ex. 30 (Kroemer Report); Plaintiffs' Ex. 32 (same). His report reveals that CTDs were specifically associated with keyboard use as early as the 1920's. *See* Defendants' Ex. 30 at 39. By the 1950's, he reports it was "extensively known in the medical profession" that CTDs were "related to the aspects of keying operations and the design features of keys and keyboards." *Id.* In the 1960's, recommendations for the redesign of keys and keyboards surfaced in the ergonomic and industry literature. *See id.* By the end of the 1970's, Dr. Kroemer reports, biomechanical research "clearly established" a connection between CTDs, keying force, repetition, and posture, and efforts were made to lessen required keying force and improve keying posture. *See id.* at 39–40.[6]

Dr. Cunitz performed a human factors analysis of the need for and adequacy of warnings with respect to injuries associated with computer keyboard use. First, he determined whether defendants' keyboard posed a risk of injury justifying a warning. He then designed a warning and determined whether it would be effective. *See* Defendants' Ex. 79 at 3–5 (Cunitz Report). As for his first determination, Dr. Cunitz concluded that "warnings of the danger of various musculoskeletal injuries were necessary" by virtue of the "known and suspected risks associated with intensive keyboard use." *Id.* at 3. As for his second determination, Dr. Cunitz generally described an appropriate warning and attached an article he authored on effective warnings. *See id.* at 4, 15.

Dr. Goldstein evaluated Mrs. Reiff following her bilateral carpal tunnel surgery. After reviewing Mrs. Reiff's medical history and examining her, Dr. Goldstein ruled out

owns Convergent Incorporated which in turn owns Convergent Technologies.

3. A newton is the amount of force required to accelerate one kilogram of mass one meter per second per second.

4. Dr. Hedge's force gauge only measures up to two newtons. To compute readings over two newtons, Dr. Hedge estimated the additional keyforces required. *See id.*

5. Ironically, despite his expert opinion, Dr. Hedge continues to type on a conventional linear keyboard like defendants'. *See* Defendants' Ex. 3 at 250 (Hedge Deposition).

6. In 1972, Dr. Kroemer developed and patented an ergonomically split keyboard like the Microsoft split-angle keyboard Mrs. Reiff now uses. *See* Plaintiffs' Ex. 31 at 8, 14 (Kroemer Curriculum Vitae).

any nonoccupational causes of Mrs. Reiff's condition and generally concluded that she developed carpal tunnel syndrome "largely, but not exclusively" due to her "work activity." Defendants' Ex. 77 at 7 (Goldstein Report).

## II. APPLICABLE STANDARDS

### A. *Standard for Admissibility of Expert Testimony*

Under Federal Rule of Evidence, 104(a), "Preliminary questions concerning the qualifications of a person to be a witness, ... or the admissibility of evidence shall be determined by the court." Thus, as a preliminary matter, a proponent of expert testimony must establish his expert is qualified and his testimony is admissible by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 n. 10, 113 S.Ct. 2786, 2796 n. 10, 125 L.Ed.2d 469 (1993) (quoting *Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987)).

To be admissible, expert testimony must meet the requirements set forth in Federal Rules of Evidence 702, 703, and 403. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741–43 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). The Court addresses the standard of admissibility of each rule in turn.

Under Rule 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

Rule 702 has three major requirements: the witness must be qualified to be an expert, the expert must testify to reliable scientific evidence, and the expert's testimony must assist the trier of fact. *See Paoli*, 35 F.3d at 741–43. The first of these requirements has been interpreted very liberally. *See id.* at 741. Exclusion is improper simply because an expert does not have the most appropriate degree or training. *Id.*

The inquiry into reliability requires the court to examine whether the expert has "good grounds" for his opinions. *Id.* at 742 (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795). The Third Circuit requires district courts to examine all factors relevant to discovering whether particular scientific evidence is reliable, including those factors listed in *Daubert* and *Paoli* as well as any other inquiry that the district court finds is relevant. *See id.*

The *Daubert–Paoli* factors are: (1) whether the expert's hypothesis can be and has been tested, (2) whether the method has been subject to peer review, (3) the known or potential rate of error, (4) the existence of standards controlling the technique's operation, (5) whether the method has been generally accepted in the scientific community, (6) the relationship of the technique to methods which have been established to have been reliable, (7) the qualifications of the expert witness, and (8) the non-judicial uses to which the method has been put.

The focus of a *Daubert* analysis "must be solely on the principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2797. In other words, the focus is "not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995). "The evidentiary requirement of reliability is lower than the merits standard of correctness." *Paoli*, 35 F.3d at 744. A judge decides whether the experts are reliable; the jury decides whether the experts are correct. *Id.*

The final requirement of Rule 702 is that the expert witness must be able to assist the trier of fact to reach accurate results. This is the so-called "fit" requirement. *See Daubert*, 509 U.S. at 589–93, 113 S.Ct. at 2795–96; *Paoli*, 35 F.3d at 742–43. To meet this requirement, the testimony proffered must be sufficiently tied to the facts of the case. Whether expert testimony fits "depends on the 'proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *Paoli*, 35 F.3d at 743 (quoting *Unit-*

ed States v. Downing, 753 F.2d 1224, 1237 (3d Cir.1985)).

While "Rule 702 focuses on an expert's methodology[;] Rule 703 focuses on the data underlying the expert's opinion." *Paoli,* 35 F.3d at 747. Rule 703 states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Therefore, the Court must "assess whether there are good grounds to rely on [an expert's] data to draw the conclusion reached by the expert." *Paoli,* 35 F.3d at 749.

Finally, Rule 403 provides for the exclusion of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." In order to exclude scientific evidence on confusion grounds, "there must be something *particularly* confusing about the scientific evidence at issue— something other than the general complexity of scientific evidence." *Id.* at 747.

B. *Standard for Summary Judgment*

Under Federal Rule of Civil Procedure 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A non-moving party may not rest upon mere allegations, general denials, or vague statements in opposition to a summary judgment motion. If the nonmoving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292 (3d Cir.1993); *Trap Rock Indus. Inc. v. Local 825, Int'l Union of Operating Eng'rs,* 982 F.2d 884, 880–91 (3d Cir.1992).

It is not the role of the judge at the summary judgment stage to weigh the evidence or to evaluate its credibility, but to determine "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court must draw all inferences in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, the Court must accept the non-movant's version as true. *Pastore v. Bell Tel. Co.,* 24 F.3d 508, 512 (3d Cir.1994).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A genuine issue of material fact for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir. 1987) (Becker, J., concurring).

III. PRODUCTS LIABILITY

In order to sustain their products liability claim, plaintiffs must establish that defendants' computer keyboard is defective and that the defect caused injury to plaintiffs. *See Zaza v. Marquess & Nell, Inc.,* 144 N.J. 34, 49, 675 A.2d 620, 627 (1996); *Feldman v. Lederle Labs.,* 97 N.J. 429, 449, 479 A.2d .374, 384–85 (1984); *Coffman v. Keene Corp.,* 133 N.J. 581, 594, 628 A.2d 710, 716 (1993). To establish a product defect under New Jersey law, plaintiffs may show either a design defect, a manufacturing defect, or an inadequate warning defect rendering defendants' product not reasonably fit, suitable, or safe for its intended or foreseeable purposes. *See Zaza,* 144 N.J. at 49–50, 675 A.2d at 628; *Feldman,* 97 N.J. at 451, 479 A.2d at 385. To establish causation, plaintiffs must show that defendants' product constituted a "substantial factor" in bringing about Mrs. Reiff's condition. *Grassis v. Johns–Manville Corp.,* 248 N.J.Super. 446, 457, 591 A.2d 671, 677

(App.Div.1991); *see also Fedorczyk v. Caribbean Cruise Lines Ltd.*, 82 F.3d 69, 73 (3d Cir.1996).

## A. Defect

Through their experts, plaintiffs allege three distinct defects in defendants' computer keyboard. First, Dr. Hedge opines defendants' keyboard is defectively designed and/or manufactured in that it requires keying forces above industry and company parameters. Second, Dr. Hedge opines that defendants' keyboard is defectively designed in that it is not ergonomically split at an angle. Third, Dr. Hedge and Dr. Cunitz opine that defendants' keyboard is defective in that it fails to warn of suspected risks associated with intensive keyboard use. The Court analyzes each alleged defect in turn.

### 1. Defective Manufacturing or Design— Excessive Keying Forces

Dr. Hedge opines that defendants' keyboard is defectively manufactured or designed in that it requires excessive keying forces. This opinion, however, suffers from a fatal flaw. Even if one accepts Dr. Hedge's assumptions—that the ANSI standard applies to a key's entire surface,[7] and that Mrs. Reiff typed on her keytops rather than centrally [8]—his testimony fails to establish that defendants' keyboard is defective within the meaning of New Jersey products liability law. Rather, Dr. Hedge merely demonstrates that defendants' keyboard is, to a very limited extent, out of compliance with the ANSI–HFS 100 technical standard.[9]

A defective product, under New Jersey products liability law, is one that is not reasonably fit, suitable, or safe for its intended or foreseeable purposes. *See* New Jersey Products Liability Act, N.J.S.A. § 2A:58C–2. ANSI–HFS 100, like defendants' internal company specifications, does not dictate health and safety standards below which products are deemed somehow unfit or unsafe. Instead, these standards serve technical purposes, stating principles of good ergonomics and ideal performance or, in the case of defendants' company specifications, setting standards for uniform production quality. *See* Defendants' Ex. 3 at 312 (Hedge Deposition) (relating the purposes of the ANSI standard); Defendants' Ex. 8 (Internal Specifications). Products that fail to meet these or other such standards may well be defective in the engineering sense, but are not necessarily defective in the products liability sense. *See* N.J.S.A. § 2A:58C–2; *cf.* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 36 (5th ed.1984) (explaining that statutory or regulatory violations can constitute negligence per se if and only if a plaintiff's injury is within the statute's or regulation's purpose).[10]

Neither Dr. Hedge's report nor the articles on which he relies bridges this crucial gap between noncompliance with industry or design specifications and liability under New Jersey products liability law. Indeed, nothing in the record can explain why an almost imperceptible deviation in the force necessary to activate a single key at its rim somehow turns a safe product into a threat to its user's health and safety. Without this evidence, Dr. Hedge's keyforce testimony cannot establish that defendants' keyboard's excessive keyforces render the keyboard unfit or unsafe within the meaning of New Jersey products liability law.[11] As such, this Court

---

7. ANSI–HFS 100, according to its terms, applies only to forces measured vertically at the center of a key.

8. Nothing in the record suggests that Mrs. Reiff types or has typed on her keytops. Dr. Hedge has neither observed Mrs. Reiff typing, interviewed her as to her typing posture and technique, or evaluated her workstation. *See* Defendants' Ex. 3 at 99–101 (Hedge Deposition).

9. Interestingly, Dr. Hedge has not submitted his own keyboard or the Microsoft split-angle keyboard he recommends to keyforce testing to gauge ANSI–HFS 100 compliance. *See* Defendants' Ex. 3 at 160, 250 (Hedge Deposition).

10. To illustrate this point further, consider the following hypothetical. Suppose defendants' keyboard requires keyforces below the ANSI-specified minimum rather than above the ANSI-specified maximum. Such an oversensitive keyboard clearly fails to comply with ANSI–HFS 100 but would, according to Dr. Hedge's theory, pose no health or safety risk to its users.

11. At oral argument, plaintiffs' counsel conceded this point.

must reject this first theory of product defect and preclude Dr. Hedge's keyforce testimony as irrelevant to this case. *See* Fed.R.Evid. 104, 402.

2. Defective Design—Split Keyboard

■ Plaintiff's second theory of product defect derives from a statement in Dr. Hedge's addendum report that defendants' computer keyboard is defective in that it is not split at an angle like the Microsoft Natural keyboard. *See* Defendants' Ex. 12 at 2 (Hedge Report dated June 19, 1996). Split-angle keyboards, like the one sold by Microsoft, purport to reduce musculoskeletal discomfort—and, in theory, musculoskeletal injury—by easing four unnatural postures: forearm pronation, ulnar deviation, wrist extension, and upper arm abduction. *See, e.g.,* Naomi G. Swanson et al., *The Impact of Keyboard Design on Comfort and Productivity in a Text–Entry Task,* 28 Applied Ergonomics 9, 10 (1997). However, according to plaintiffs' own expert, the ergonomic literature fails to demonstrate that split-angle keyboards either reduce typing discomfort or reduce the risk of developing musculoskeletal injuries. *See* Defendants's Ex. 3 at 197 (Hedge Deposition) (Q: "As a scientist can you cite to me one peer-reviewed scientific or medical journal that indicates that the use of a split or variable geometry keyboard reduces the incidents of carpal tunnel syndrome?" A: "No.").[12]

Dr. Hedge's addendum report cites one article in support of (and none in opposition to) his conclusion that split-angle keyboards reduce typing discomfort and thus prevent upper-extremity disorders. *See* Pat Tittiranonda et al., *Three Month Clinical Prospec-*

*tive Intervention Study Using Four Keyboards* (1996). However, that article merely concludes that some split-angle keyboards are more comfortable than conventional keyboards to typists with prior hand and wrist pain. *See id.* at 1–2.[13] Furthermore, a more recent, shorter-term study contradicts this limited finding, suggesting "limited differences in performance, discomfort and fatigue outcomes between the alternative keyboards and [the] standard keyboard" tested. *See* Swanson et al., *supra,* at 15. Dr. Hedge's own out-of-court writings similarly suggest little, if any, benefit to the split-angle keyboard design. *See, e.g.,* Alan Hedge et al., *Toward Pain–Free Computing,* Ergonomics in Design, Jan. 1996, at 4–6 [hereinafter Hedge et al., *Pain–Free* ] (preferring a conventional keyboard placed in a downward-sloping keyboard tray); Hedge et al., *Beneficial Effects, supra,* at 1–5, 42–44 (same); Hedge & Powers, *Wrist Postures, supra,* at 510, 514–15 (same).

Thus, the only proffered evidence linking split-angle keyboard design with a reduced risk of developing carpal tunnel syndrome is a single sentence in Dr. Hedge's addendum report. As this discussion demonstrates, the foundation for this opinion is most flimsy. In drawing his conclusion, Dr. Hedge performed no scientific study; rather, he merely referenced a single journal article—at odds with his own research—which in truth stands for a proposition much more modest than that for which he cites it. Because this expert opinion on design defect falls short of the reliability standards of *Daubert, Paoli,* and Federal Rule of Evidence 702, this Court will preclude it. Because no other evidence es-

---

12. *See also* Alan Hedge & Gregory Shaw, *Effects of a Chair–Mounted Split Keyboard on Performance, Posture and Comfort* (1996) [hereinafter Hedge & Shaw, *Chair–Mounted* ] ("Studies testing either fixed-angle or adjustable angle split keyboards with conventional office furniture have not confirmed substantial postural benefits."); Alan Hedge et al., *Beneficial Effects of a Preset Tiltdown Keyboard System on Posture and Comfort in Offices* 2 (1995) [hereinafter Hedge et al., *Beneficial Effects* ]; ("[S]tudies of the effects of [alternative keyboard designs] on typing posture and performance have produced unimpressive results."); Alan Hedge & James Powers, *Wrist Postures While Keyboarding,* 38 Ergonomics 508, 509–10 (1995) [hereinafter Hedge & Pow-

ers, *Wrist Postures* ] ("Comparison ... between a conventional keyboard and two alternative split-keyboard designs showed no significant improvements in comfort [with the alternative designs]."); Swanson et al., *supra,* at 10 ("Few data are available to substantiate the efficacy of these alternative keyboard designs in the prevention or alleviation of musculoskeletal discomfort and [work-related musculoskeletal disorders].").

13. This conclusion is consistent with Mrs. Reiff's deposition testimony that she found typing on her Microsoft keyboard more comfortable. *See* Defendants' Ex. 27 at 84 (Mrs. Reiff Deposition).

tablishes any connection between split-angle keyboards and a reduced risk of carpal tunnel syndrome, this Court must reject plaintiffs' second theory of product defect, as well.

### 3. Lack of Warnings

■ Even if a product is properly designed and manufactured, it may still be unsafe for its intended or foreseeable uses if it is not accompanied by adequate warnings or instructions. *See Suter v. San Angelo Foundry & Mach. Co.*, 81 N.J. 150, 176, 406 A.2d 140, 153 (1979). Accordingly, New Jersey law places on manufacturers a duty to warn "foreseeable users of all hidden or latent dangers that would arise out of a reasonably anticipated use of [their] product[s]." *Campos v. Firestone Tire & Rubber Co.*, 98 N.J. 198, 206–07, 485 A.2d 305, 308 (1984). Indeed, to encourage manufacturers to abide by this duty and provide adequate warnings, the Supreme Court of New Jersey adopted a heeding presumption whereby a court may presume for causation purposes that a plaintiff "would have followed an adequate warning had one been provided." *Coffman*, 133 N.J. at 603, 628 A.2d at 720.

Defendants do not argue that they placed a warning on Mrs. Reiff's computer keyboard concerning hidden or latent dangers arising out of the keyboard's use. Rather, defendants argue that they bore no duty to warn because Mrs. Reiff's computer keyboard contains no hidden or latent dangers. Accordingly, defendants request that this Court decide plaintiffs' failure to warn claim as a matter of law without reaching the substance of Dr. Cunitz's and Dr. Hedge's expert testimony.

■ Two recent opinions from this District squarely address this issue and conclude that keyboard manufacturers need not warn of risks of carpal tunnel syndrome. *See Schneck v. International Bus. Machs. Corp.*, No. 92–4370(GEB), slip op. at 58 (D.N.J. June 25, 1996); *Finley v. NCR Corp.*, No. 92–5242(JHR), slip op. at 10, 1996 WL 885790 (D.N.J. Jan. 22, 1996). They reason, 

> While "[a] manufacturer has a duty to warn foreseeable users of all hidden or latent dangers that would arise out of a reasonably anticipated use of its product,"

*Campos,* [98 N.J. at 206, 485 A.2d at 308] "there is no duty to warn about the physical manipulation inherent in the use of certain objects which can in some persons and under some circumstances cause [carpal tunnel syndrome]." *Finley,* [slip op. at 10] (citing *Creamer v. International Bus. Machs. Corp.*, No. 89–1026, slip op. at 6–7 (3d Cir. May 18, 1989 [877 F.2d 54 (table) ] )).

*Schneck,* slip op. at 58 (citing additional cases). Thus, as a threshold matter, these courts require that a carpal-tunnel plaintiff establish that the "risk" associated with the intensive use of a computer keyboard is not simply the repetitive motion required to use it. *See Schneck,* slip op. at 58; *Finley,* slip op. at 10–11; *cf. Creamer,* slip op. at 6–7.

This Court finds this reasoning persuasive. Products whose use requires physical activity often entail a risk that such use will cause harm—harm not from the product itself but harm from the manner of a product's use. Consider the snow shovel. Each year, hundreds of people suffer heart attacks, strain their backs, and pull various muscles shoveling snow from their driveways. Since any harm posed lies not in the snow shovel but rather in its use in a particular manner, by a particular person with particular physical attributes, the law does not require that snow shovels contain warnings. For the same reasons, the law does not and ought not require that computer keyboards contain warnings relating to a keyboard's use in a particular way, by a particular person with particular physical characteristics and work habits.

Moreover, according to plaintiffs' own experts, it is one's work environment and not one's computer keyboard which truly puts a typist at risk of developing carpal tunnel syndrome. Keyboards as well as chairs, desks, monitors, lamps, document holders, and other elements of one's workstation can be arranged, configured, and designed in an unlimited number of ways. A typist's work habits, posture, typing technique, and stamina further add to this mix. Considered in this context, a computer keyboard poses no greater threat than does a chair, desk, monitor, or any other component of a work envi-

ronment.[14] Thus, requiring a keyboard to contain a warning that a particular work environment may lead to health problems makes no more sense than requiring a desk or chair or monitor to carry the same warning.

Plaintiffs' proffered expert testimony—that repetition, force, duration, posture, and a host of other factors together contribute to the development of carpal tunnel syndrome—falls short of the requirement that the risk associated with the use of defendants' product be something more than the physical activity required to use it. *See, e.g.,* Defendants' Ex. 6 at 6 (Hedge Report dated June 10, 1995); Defendants' Ex. 30 at 2–3 (Kroemer Report). Plaintiffs' experts, at most, merely establish what does not give rise to a duty to warn: that some persons, particularly those predisposed to carpal tunnel syndrome, *see* Defendants' Ex. 30 at 2 (Kroemer Report) (listing factors and citing authorities), bear a greater risk of developing carpal tunnel syndrome when typing in a certain way (quickly or heavily), sitting in a certain way (with poor posture or at a poorly designed workstation), and working in a certain way (without rest breaks). Thus, this Court must conclude that defendants had no duty to warn prospective users of any risks associated with the use of their computer keyboard within Mrs. Reiff's overall work environment. Accordingly, plaintiffs' third theory of product defect must fail, as well. *See Griesenbeck v. American Tobacco Co.,* 897 F.Supp. 815, 820 n. 3 (D.N.J.1995) ("[W]ithout a duty to warn, there cannot be any failure to warn.").

## B. *Causation*

■ To sustain a products liability claim against defendants, plaintiffs must also prove causation—that defects in defendants' computer keyboard in fact caused Mrs. Reiff's injuries. *See Zaza,* 144 N.J. at 39, 675 A.2d at 627; *Feldman,* 97 N.J. at 449, 479 A.2d at 384–85. Where, as here, several variables

may have combined to produce a single injury, plaintiffs need only show that a defect in defendants' product constituted a substantial factor in bringing about Mrs. Reiff's condition. *See Fedorczyk,* 82 F.3d at 73; *Grassis,* 248 N.J.Super. at 457, 591 A.2d at 677.

To this end, plaintiffs offer the expert testimony of Drs. Hedge and Goldstein. First, based on his keyforce analysis, Dr. Hedge opines that Mrs. Reiff's prolonged use of defendants' keyboard was a "salient factor" contributing to her injuries. Defendants' Ex. 10 (Hedge Report dated May 17, 1996). Dr. Goldstein, after examining Mrs. Reiff, concludes more generally that her "work activity" largely caused her to develop carpal tunnel syndrome. Defendants' Ex. 77 at 7 (Goldstein Report dated May 14, 1996). The Court will address the admissibility of each opinion in turn.

### 1. Hedge Opinion

■ Dr. Hedge bases his specific causation opinion on his keyforce testing of defendants' keyboard and on his review of the keyboard's technical information. *See* Defendants' Ex. 10. Because risks for carpal tunnel syndrome arise from a mix of various factors, including keying force, keying repetition, and posture, Dr. Hedge originally intended to analyze the tasks Mrs. Reiff performed on defendants' keyboard, and her typing technique and posture. *See* Defendants' Ex. 6 at 6 (Hedge Report dated June 10, 1995). However, he has yet to do so. *See* Defendants' Ex. 3 at 99–101, 230 (Hedge Deposition) (calling his failure to conduct these analyses "unfortunate").

Applying the *Daubert–Paoli* factors, Dr. Hedge's methodology proves unreliable. Even if one assumes that Dr. Hedge's hypothesis—that defendants' keyboard substantially caused Mrs. Reiff's injuries—is testable through an ergonomic analysis of the various factors affecting her typing activity,[15]

---

**14.** With all of these competing variables, it is not surprising that Dr. Goldstein concludes in his expert report that it is Mrs. Reiff's "work activity," as opposed to her keyboard, which caused her current condition. Defendants' Ex. 77 at 7 (Goldstein Report).

**15.** Given the number of factors which might impact Mrs. Reiff's condition—workstation configuration, posture, typing technique, exerted keyforce (which may exceed the minimum necessary for activation), number and frequency of rest breaks, and other life activities—the testability of

Dr. Hedge conducted no such analysis. He did not observe Mrs. Reiff's typing technique or posture, question her about her work habits, determine the configuration of her workstation, or evaluate the kind of material she typed at her computer keyboard. *See* Defendants' Ex. 3 at 99–101 (Hedge Deposition). As a result, Dr. Hedge gave no consideration to alternative ergonomic causes of Mrs. Reiff's carpal tunnel syndrome. *Cf.* Defendants' Exs. 25–26 (Hedge Articles) (examining posture among other factors contributing to carpal tunnel syndrome). Indeed, without knowing how hard Mrs. Reiff types, Dr. Hedge could not accurately determine whether defendants' keyboard or Mrs. Reiff's own typing technique was more responsible for the keyforces she expended typing.

In *Diaz v. Johnson Matthey, Inc.*, 893 F.Supp. 358 (D.N.J.1995), this Court held an expert opinion on specific causation unreliable where an expert similarly failed to account for possible alternative causes of a plaintiff's illness. *See id.* at 360 (citing *Paoli*, 35 F.3d at 760). Like the precluded experts in *Paoli* and *Diaz*, Dr. Hedge has offered "no reasonable explanation as to why he ... still believe[s] that the defendants' [computer keyboard was] a substantial factor in bringing about [Mrs. Reiff's] illness." *Paoli*, 35 F.3d at 760; *Diaz*, 893 F.Supp. at 360. Like the precluded expert in *Diaz*, he "ignores or is unable to satisfactorily discount [alternative causes]" and "did little, if anything, to rule [them] out." *Diaz*, 893 F.Supp. at 360 (internal quotation marks omitted). In view of this glaring deficiency in Dr. Hedge's methodology, this Court holds his testimony on specific causation unreliable under Federal Rule of Evidence 702. The Court will preclude it accordingly.

### 2. Goldstein Opinion

■ Dr. Goldstein's causation opinion fails to identify defendants' computer keyboard as a substantial cause of Mrs. Reiff's upper extremity condition. After determining that Mrs. Reiff has no predisposing factors to carpal tunnel syndrome, he generally opines that Mrs. Reiff's "work activity" largely caused her injuries. *See* Defendants' Ex. 77 at 7 (Goldstein Report dated May 14, 1996). However, "work activity" is not a synonym for "computer keyboard." As Dr. Goldstein's conclusion fails to provide any insight as to the specific cause of Mrs. Reiff's injuries—her keyboard, her chair, her posture, her workstation configuration, or her typing technique—this Court will preclude his causation testimony as unhelpful to the trier of fact. *See* Fed.R.Evid. 702; *Paoli*, 35 F.3d at 741–43.

### IV. OTHER CLAIMS

#### A. *Negligence and Breach of Warranty Claims*

■ Under New Jersey products liability law, negligence and breach of warranty are no longer viable as separate claims for harm caused by · a defective product. *See* New Jersey Products Liability Act, N.J.S.A. § 2A:58–C1; *Tirrell v. Navistar Intern, Inc.*, 248 N.J.Super. 390, 398, 591 A.2d 643, 647 (App.Div.1991) ("[C]ommon-law actions for negligence or breach of warranty are subsumed within the new statutory cause of action."), *certif. denied*, 126 N.J. 390, 599 A.2d 166 (1991). Because plaintiffs' negligence and breach of warranty counts allege harm caused by defendants' allegedly defective product, it falls squarely within the Products Liability Act. *See* N.J.S.A. § 2A:58C–1 (delimiting the scope of the Products Liability Act). Therefore, plaintiffs' negligence and breach of warranty counts are subsumed by their products liability count. The Court will grant defendants summary judgment as to plaintiffs' negligence and breach of warranty counts accordingly.

#### B. *Conspiracy Claim*

■ To establish a civil conspiracy claim, plaintiffs must show the existence of an agreement between defendants and another to commit an unlawful act or a lawful act by unlawful means, and an overt act in further-

---

Dr. Hedge's hypothesis is highly questionable. Neither Dr. Hedge or any other expert has shown how one can isolate the impact of one factor, the force necessary to activate particular keys, from the welter of other possible causative factors.

ance of the agreement resulting in damages to plaintiffs. *See Hampton v. Hanrahan,* 600 F.2d 600, 620–21 (3d Cir.1979). Neither an unlawful act nor unlawful means used to commit a lawful act can reasonably be gleaned from the submitted pleadings, affidavits, and depositions. Accordingly, this Court will grant summary judgment to defendants on plaintiffs' conspiracy count as well.

### C. *Loss of Consortium Claim*

■ Loss of consortium is a derivative claim which depends for its sustenance upon a viable tort claim of the spouse. *See Reilly v. Prudential Property & Casualty Ins. Co.,* 653 F.Supp. 725, 735 (D.N.J.1987). Because this Court has granted defendants summary judgment on each of Mrs. Reiff's claims, Mr. Reiff, as her husband, has no foundation from which to derive a loss of consortium claim. Accordingly, this Court will also grant summary judgment to defendants on plaintiffs loss of consortium count.

### V. CONCLUSION

Science coexists uneasily with litigation's adversary system, as the imperatives of partisan advocacy coupled with powerful economic incentives often seem to overwhelm good science. Lawyers, judges, and forensic experts sometimes engage in what literature teachers call willing suspension of disbelief. Scientific propositions that would cause even laymen to gasp in disbelief are routinely argued in courts of law. Such are the dangers of a legal system allowing partisan expert testimony.[16]

Imposing carpal tunnel syndrome liability based on alleged defects in keyboard design would result in a nationwide explosion of litigation at societal costs which are almost unimaginable. In a recent case sent to the jury by Judge Weinstein of the Eastern District of New York, a jury awarded damages

in excess of five million dollars. *See Keyboard Maker is First to Lose RSI Case,* Nat'l L.J., Dec. 23, 1996, at B2 (reporting on *Geressy v. Digital Equip. Corp.*). Presumably *Daubert* and *Paoli* permit a trial court to be sure that this avalanche of litigation is based on something at least resembling good science. The evidence proffered in this case does not cross that threshold.

Because much of plaintiffs' proffered expert testimony fails to meet the standards set by the Federal Rules of Evidence, the Court will grant defendants' motion to preclude expert testimony in part. Because without this testimony plaintiffs cannot sustain their products liability, civil conspiracy, and loss of consortium causes of action, this Court will grant summary judgment on all counts in defendants' favor and dismiss this action in its entirety.

---

**16.** Almost a century ago, when the use of hired-gun scientific witnesses was less common and on shakier evidentiary grounds, Judge-to-be Learned Hand deplored the growing trend towards the use of partisan scientific opinion testimony, deeming it an "evil in the present system." Learned Hand, *Historical and Practical Considerations Regarding Expert Testimony,* 15 Harv. L.Rev. 40, 55 (1901). Almost a quarter of a century later, as a Second Circuit Judge, he noted in dissent that "the system which submits such [scientific] questions to the decision of laymen upon the evidence of partisan experts apparently satisfies the profession." *Elyria Iron & Steel Co. v. Mohegan Tube Co.,* 7 F.2d 827, 831 (2d Cir.1925) (L. Hand, J., dissenting). Apparently, it still does.